

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00900-CV

**IN THE ESTATE OF** Marjorie A. **CHILDS**, Deceased

From the Probate Court No. 2, Bexar County, Texas
Trial Court No. 2014PC0056
Honorable Tom Rickhoff, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: April 22, 2020

AFFIRMED

Mollie Allen Childs appeals a judgment declaring an agreement between Mollie and her

two sisters regarding the ownership of two brokerage accounts to be valid and enforceable based

on a jury's findings. The jury found the agreement was supported by consideration and Mollie's

failure to comply with the agreement was not excused by a mutual mistake. On appeal, Mollie

challenges the legal and factual sufficiency of the evidence to support the jury's findings. Mollie

also challenges the award of attorney's fees. We affirm the probate court's judgment.

### BACKGROUND

This is the second appeal to this court from the underlying probate case. In the first appeal,

this court reversed a summary judgment in Mollie's favor holding "Mollie did not conclusively

establish either the lack of consideration or a mutual mistake of material fact." *In re Estate of*

*Childs*, No. 04-15-00623-CV, 2016 WL 3452624, at *4 (Tex. App.—San Antonio June 22, 2016, no pet.) (mem. op.) (*Childs I*). We then remanded the cause for further proceedings. *Id*.

Mollie, Susan Addison, and Pamela McCaskill are the three daughters of Marjorie Allen Childs. Marjorie was the only daughter of Bertha Allen.

Bertha's friend, Alma Fehr, bequeathed Bertha some shares of stock in Fehr Baking Company. By the time Bertha executed her will in 1980, the shares of stock in Fehr Baking Company had been converted into shares of stock in Campbell Taggart Associated Bakeries, Inc. Bertha's will devised those shares of stock under the following provision of her will:

II.
I give all shares of stock owned by me in Campbell Taggart Associated Bakeries, Inc. at the time of my death to my daughter, Marjorie Allen Childs, with the request that she use only the income in cash dividends from said shares during her lifetime and that on her death she make provision for said shares to be divided equally among her daughters, or the issue of any deceased daughter. Should it become wise at any time to sell these shares, it is my desire that the proceeds, or any reinvestment of the proceeds, be held and disposed of by my daughter at her death in the same manner.

Bertha passed away in 1981. At some point, Campbell Taggart was acquired by Anheuser Busch Companies, and the Campbell Taggart shares then held by Marjorie were converted into shares of stock in Anheuser Busch.

In 1992 or 1993, Marjorie placed some of the Anheuser Busch shares into a joint brokerage account which she and Mollie could use as leverage to borrow and invest in other stock. Mollie testified the purpose of opening the brokerage account was to diversify Marjorie's assets. While the shares were held in the brokerage account, Marjorie continued to receive the income from the dividends paid on the shares while Mollie received all other income generated by the brokerage account. At some point, the brokerage account was closed. Some of the shares transferred to the brokerage account were sold to pay the brokerage account debt that was owed, and the remaining

shares were placed into an account held by a revocable trust. Marjorie and Mollie were the co-trustees of the trust, and Mollie, Pamela, and Susan were the beneficiaries.

On November 20, 2008, Marjorie executed a will containing the following provision regarding the shares of stock she was bequeathed by Bertha:

> Pursuant to the requirements of the life estate created for my benefit under Section II of the Will of Bertha Allen, the Anheuser Busch stock, which is derived from the Campbell Taggart Associated, Inc., stock addressed in the aforementioned Section II of Bertha Allen's Will, shall be distributed to my daughters and their descendants, per stirpes. Furthermore, and also pursuant to the requirement of the life estate created for my benefit under Section II of Bertha Allen's Will, if at the time of my death I no longer own the Anheuser Busch stock, then the proceeds or reinvestment of the proceeds shall be distributed to my daughters and their descendants, per stirpes.

In late 2008, Anheuser Busch was acquired by another company, and the Anheuser Busch shares held by Marjorie were redeemed by the acquiring company for approximately $5.8 million. The Anheuser Bush shares then held by the trust were apparently redeemed in a separate transaction than the shares that were never transferred to the brokerage account. The money paid for the shares held by the trust, approximately $1 million, was used to open a transfer on death brokerage account with Raymond James & Associates, Inc. The money paid for the other shares, approximately $4.8 million, was used to open a transfer on death brokerage account with RBC Correspondent Services which the parties generally refer to as the Federated Securities account.[1]

Mollie testified she prepared the account applications for both accounts which Marjorie then signed. The Raymond James account listed Mollie as the only beneficiary. The Federated Securities account listed Mollie, Pamela, and Susan as beneficiaries. Although Pamela and Susan received statements for the Federated Securities account and were able to request trades in that account, they did not receive any information regarding the Raymond James account.

---

[1] The account application refers to RBC Correspondent Services while the account statements refer to Federated Securities.

After the Anheuser Busch stock redemption, Pamela, Susan, and Mollie began exchanging e-mails regarding the transfer on death accounts and the terms of Bertha's and Marjorie's wills. Pamela, Susan, and Mollie all initially believed Bertha's will gave Marjorie a life estate in the shares of stock she received under Bertha's will with Pamela, Susan, and Mollie as equal remaindermen. In the e-mails, Pamela and Mollie discussed whether the transfer on death accounts altered that disposition in the wills. Although Susan was not as involved in the discussion, she was copied on several e-mails, and sent at least one e-mail asking about the Raymond James account. As a result of their discussions, Pamela, Mollie, and Susan entered into an agreement in 2012 which provided, in pertinent part as follows:

Agreement Regarding Remainder Interests
Of Bertha Allen Life Estate

Pamela Ann Childs McCaskill (Pam), Susan Kaye Childs Addison (Susan), and Mollie Allen Childs (Mollie) are the three daughters and only children of Marjorie A. Childs. For value received and hereby acknowledged Pam, Susan and Mollie hereby agree as follows:

The entire assets subject to the life estate created by the will of Bertha Allen and referenced in the will of Marjorie A. Childs signed November 20, 2008, are contained within 2 brokerage accounts styled "Mollie Childs POA U/W Bertha Allen DTD 12/5/2008 FBO Marjorie Childs Life Tenant". One brokerage account is held under account [number] at Federated Securities, the other under account [number] at Raymond James & Associates. In the event Pamela, Susan and Mollie are living at the time of death of Marjorie A. Childs, the accounts are to be divided and distributed as follows:

The Federated Securities account to be split equally and distributed between Pam and Susan; the Raymond James account to be distributed in its entirety to Mollie.

In the event one or two of the distributees predeceases Marjorie A. Childs, that portion of the assets subject to the life estate that would have been distributed to the heir/heirs shall be distributed in equal parts to the surviving heir/heirs named under the wills of Bertha Allen and Marjorie A. Childs.

Marjorie died on December 17, 2013. After Marjorie's will was admitted to probate, Mollie filed a lawsuit seeking a declaratory judgment that the 2012 agreement was unenforceable

based on mutual mistake or lack of consideration. Pamela and Susan filed various counterclaims including counterclaims seeking to declare the 2012 agreement was valid and enforceable. As previously noted, the probate court initially granted summary judgment in Mollie's favor; however, this court reversed the judgment and remanded the cause to the probate court for further proceedings. *See id.*

Prior to trial, Pamela and Mollie settled their claims against each other. After three days of evidence was presented to the jury, the jury was charged with answering the following questions on the issues of consideration and mutual mistake:

QUESTION NO. 1:

*With respect to the 2012 Agreement [PX26], do you find that Mollie did receive a benefit or Susan did incur a detriment?*

Answer "Yes" or "No."

Answer: _____

QUESTION NO. 2:

*Was Mollie Child's failure to comply with the 2012 Agreement [PX26] excused?*

Failure to comply with an agreement is excused if the agreement was made as the result of a mutual mistake.

A mutual mistake results from a mistake of fact common to both parties if both parties had the same misconception concerning the fact in question. A mistake by one party but not the other is not a mutual mistake.

A mistake of persons as to their private legal rights and interests is a mistake of fact.

Answer "Yes" or "No."

Answer: _____

The jury answered the first question "yes" and the second question "no."[2] After denying Mollie's motion for a judgment notwithstanding the verdict, the probate court entered judgment declaring the 2012 agreement to be valid and enforceable and awarding Susan attorney's fees. The probate court subsequently denied Mollie's motion for new trial. Mollie appeals.

**SUFFICIENCY**

In her first two issues, Mollie challenges the legal and factual sufficiency of the evidence to support the jury's findings.

## A.    Burden of Proof

Mutual mistake is an affirmative defense. *Santos v. Mid-Continent Refrigerator Co.*, 471 S.W.2d 568, 569 (Tex. 1971) (per curiam); *Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App.—San Antonio 2011, pet. denied). "'The hallmark characteristic' of an affirmative defense 'is that the burden of proof is on the defendant to present sufficient evidence to establish the defense and obtain the requisite [jury] findings.'" *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 333 (Tex. 2020) (quoting *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156 (Tex. 2015)).

"The existence of a written contract . . . presumes consideration for its execution." *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 761 (Tex. App.—Tyler 2018, pet. denied); *accord Doncaster v. Hernaiz*, 161 S.W.3d 594, 603 (Tex. App.—San Antonio 2005, no pet.). "[T]he party alleging lack of consideration has the burden of proof to rebut th[e] presumption."[3] *TLC Hosp., LLC*, 570 S.W.3d at 761; *accord Doncaster*, 161 S.W.3d at 603.

---

[2] Because the jury answered "no" to the second question, the jury did not answer the following additional question because it was premised on a "yes" answer to the second question: "Did Susan Addison substantially rely to her detriment on Mollie Childs' promise, if any, and was this reliance foreseeable by Mollie Childs?"

[3] We disagree with Mollie's contention that the jury charge altered this burden of proof. We also note this court has generally stated "what constitutes consideration is a question of law." *Phila. Indem. Ins. Co. v. White*, No. 04-12-00721-CV, 2017 WL 32899, at *4 (Tex. App.—San Antonio Jan. 4, 2017, no pet.) (mem. op.). *But see Hous. Med. Testing Servs., Inc. v. Mintzer*, 417 S.W.3d 691, 696 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("As an initial

**B.      Standard of Review**

"The test for legal sufficiency is 'whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.' We credit evidence favoring the finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not." *Teal Trading & Dev., LP*, 593 S.W.3d at 333 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "A legal sufficiency challenge fails if more than a scintilla of evidence supports the finding." *Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019).

In reviewing a factual sufficiency issue, we consider all the evidence supporting and contradicting the finding. *Plas–Tex., Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). "When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In our review, we "must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id*.

When reviewing the sufficiency of the evidence supporting a jury's findings, "we do not serve as a fact finder, pass upon the credibility of witnesses, or substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a different conclusion could be

---

matter, it was unnecessary for the jury to find that consideration supported the parties' agreement because the question of consideration, while sometimes based upon ultimate facts found by the jury, is generally a question of law."); *Sibley v. Lawson*, No. 11-12-00235-CV, 2014 WL 4347837, at *5 (Tex. App.—Eastland Aug. 29, 2014, no pet.) (mem. op) ("The parties' dispute regarding the consideration supporting the 2006 note is a genuine issue of material fact that precludes summary judgment."). However, both the Texas Supreme Court and this court in *Childs I* have reversed summary judgments, holding the absence of consideration was not conclusively established, and, in its decision, the Texas Supreme Court remanded the cause for "a trial on the merits." *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991); *In re Estate of Childs*, 2016 WL 3452624, at *4. On appeal, neither party raises a challenge to the submission of the issue to the jury.

supported." *Hausman v. Hausman*, 199 S.W.3d 38, 41 (Tex. App.—San Antonio 2006, no pet.). "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another." *City of Keller*, 168 S.W.3d at 819 (footnote omitted).

## C.    Consideration

As this court asserted in *Childs I*:

> "Consideration is a bargained-for exchange of promises or return performance and consists of benefits and detriments to the contracting parties. . . .  The surrender of a legal right constitutes valid consideration to support a contract." *Marx v. FDP, LP*, 474 S.W.3d 368, 378 (Tex. App.—San Antonio 2015, pet. denied).  "The compromise of doubtful and conflicting claims is good and sufficient consideration to uphold a settlement agreement." *Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App.—San Antonio 2011, pet. denied).  "To constitute valid consideration, forbearance to sue must be upon a right asserted in good faith, and as to a contention which the party relying on the forbearance had reasonable grounds for believing would be upheld." *S.A. Dome, L.L.C. v. Maloney Dev. P'ship, Ltd.*, No. 04-04-00586-CV, 2005 WL 1398106, at *3 (Tex. App.—San Antonio June 15, 2005, no pet.) (mem. op.).

2016 WL 3452624, at *3.

Under the facts of this case, we find the Eastland court's decision in *Iden v. Ackerman*, 280 S.W.2d 643 (Tex. App.—Eastland 1955, writ ref'd), instructive.  In *Iden*, Ellis and Dorothy Iden filed a suit against Mildred Ackerman and Helen Clanton seeking to rescind and cancel a mineral deed which conveyed to Mildred and Helen a mineral interest in an eighty-acre tract of land.  *Id.* at 644–45.  Mildred and Helen were the daughters of Clyde and Effie McKee, and Dorothy was the sister of either Clyde or Effie.  *Id*.

In 1934, Clyde and Effie purchased an eighty-acre tract of land, executing two vendor's lien notes as part of the consideration for the purchase which notes constituted community debt.  *Id*.  After Effie died intestate in 1935, Clyde was unable to pay the vendor's lien notes, so he

conveyed the eighty-acre tract of land to Ellis who assumed the debt as partial consideration for the conveyance. *Id*. at 645. Ellis subsequently paid the vendor's lien notes in full. *Id*.

In 1954, Mildred filed an affidavit in the deed records reciting that she and Helen owned and claimed an interest in the eighty-acre tract of land as Effie's heirs. *Iden*, 280 S.W.2d at 645. A few days later, Ellis and Dorothy executed a mineral deed conveying a mineral interest in the land to Mildred and Helen, and, in exchange, Mildred and Helen executed a quitclaim deed conveying to Ellis and Dorothy any interest they had in the surface estate of the land. *Id*. In their subsequent suit, Ellis and Dorothy asserted the quitclaim deed did not convey any interest to them because Mildred and Helen did not have any interest in the land. *Id*. Therefore, Ellis and Dorothy alleged the mineral deed and the quitclaim deed lacked consideration. *Id*.

After a bench trial, the trial court entered judgment in favor of Mildred and Helen, finding the parties entered into a settlement agreement which they made effective by executing the deeds. *Id*. at 646. On appeal, Ellis and Dorothy asserted no evidence existed of a dispute between the parties at the time the settlement was purportedly consummated. *Id*. *Iden* rejected the assertion:

> We cannot agree with the contention that the contract of compromise and settlement was without consideration. Generally, a mutual agreement to compromise a dispute is of itself a valuable consideration sufficient to support the contract. It was found by the court and appellants concede that Mildred Ackerman and Helen Clanton, in good faith, believed that they, as heirs of their mother, owned an interest in the land. The evidence shows that appellees were pressing their claim. Under such circumstances there was a valuable consideration for a contract of compromise in compliance with which deeds were exchanged vesting in the parties agreed interests in the land.

*Id*. (citations omitted). The court further noted the disputed claim was sufficient consideration even though Mildred and Helen's claim was in fact "unfounded." *Id*. (quoting 15 C.J.S. *Compromise & Settlement* § 11); *see also Burgamy v. Davis*, 313 S.W.2d 365, 367 (Tex. App.— Fort Worth 1958, no writ) ("The test is not whether the debtor was correct in his contention, in that he really had a legal or equitable defense to the claim in whole or in part, but consists in the

fact that he in good faith urged or asserted a defense which he really believed was substantial."); *In re Swift*, 198 B.R. 927, 939 (Bankr. W.D. Tex. 1996) ("It is settled law that an agreement to release a claim held in good faith, even if the claim in fact turns out to be without merit, is sufficient consideration to support a compromise and settlement."). Therefore, having found "there was evidence of a dispute between the parties at the time of the compromise agreement," the court held the agreement was supported by consideration. *Iden*, 280 S.W.2d at 646. After further rejecting Ellis and Dorothy's argument regarding a mutual mistake, the court stated the law and equity favor settlements among family members:

> Voluntary compromise settlements, . . . among members of the same family . . . where a claim is asserted in good faith by one or more of the parties and they intentionally put an end to all controversy by a voluntary transaction in the way of a compromise, are highly favored by courts of equity. They will not be disturbed for any ordinary mistake either of law or fact. Where all parties have the same knowledge, or means of obtaining knowledge, in respect to the circumstances concerning their rights, and there is no fraud, misrepresentation, concealment or conduct otherwise inequitable on the part of the other party, voluntary settlements entered into should be upheld, although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed had the dispute been brought before it for decision.

*Id*. at 647 (quoting *Wedegartner v. Reichert*, 218 S.W.2d 304, 309 (Tex. App.—Waco 1948, writ ref'd n.r.e.)).

In the instant case, the e-mails exchanged between Mollie, Pamela, and Susan are evidence of a dispute between them regarding their respective rights under the wills and the effect of the transfer on death accounts on those rights. Although Susan may have been less vocal in the dispute, there is sufficient evidence that she had the same dispute and concern as evidenced by her specific request for information regarding the Raymond James account.[4] We recognize that the

---

[4] We note the evidence included Pamela's response to an e-mail from Mollie dated March 4, 2012. In Mollie's e-mail, she pleads with Pamela not to "do this" in response to Pamela's e-mail informing Mollie she would be hearing from her "directly" after she had spoken with Susan "or you and mother will be hearing from someone representing

probate court subsequently entered a partial summary judgment concluding that the bequeath of the Campbell Taggert stock in Bertha's will conveyed the stock "outright to her daughter, Marjorie Childs, and did not create a life estate." But the fact that the dispute was unfounded under the law does not affect the jury's finding that consideration existed. *See Iden*, 280 S.W.2d at 646. Just as Mildred and Helen were "pressing their claim" that they owned an interest in the land in *Iden*, *see id.*, the jury could find from the evidence in the instant case that Susan was also "pressing [her] claim" that she was entitled to one-half of the Federated Securities account. Susan based her claim on the life estate she believed was created by Bertha's will and the prior conveyance of stock into the joint brokerage account—from which Mollie received income of an undisclosed amount and which resulted in the sale of some shares of stock to pay off the account debt at the time the account was closed.[5]

In her reply brief, Mollie asserts the 2012 agreement was not a family settlement agreement as that term is used in the probate context. We agree. *See In re Estate of Lee*, 551 S.W.3d 802, 816 n.10 (Tex. App.—Texarkana 2018, no pet.) ("The Agreement is not properly classified as a family settlement agreement because it does not dispose of all of the estate's property."); *In re Estate of Halbert*, 172 S.W.3d 194, 200 n.11 (Tex. App.—Texarkana 2005, pet. denied) (noting family settlement agreements "must contain both an agreement not to probate a will *and* an agreed plan of distribution to replace the plan set forth in the will"). We disagree, however, that this affects the jury's finding. A settlement agreement is favored in law and equity in the probate context even if the agreement is not considered a "family" settlement agreement. *See*

---

us." In Pamela's response to Mollie's plea, Pamela informed Mollie that Susan's attorney told her she had a case three years ago, and Susan had not spoken to Pamela since Pamela would not join her in a lawsuit. Pamela further noted, "She said that you would probably continue to try and screw us—and based upon the last four years of doing battle with you over almost everything to do with the RBC account and your last e[-]mail it is clear to me that perhaps she was correct."

[5] The jury could also have found from the evidence that one-third of the total number of shares of Anheuser Busch stock then held by Marjorie had been transferred to the joint brokerage account.

*Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997) ("Texas law favors and encourages voluntary settlements and orderly dispute resolution.").

We overrule Mollie's first issue.

**D.       Mutual Mistake**

Mollie next challenges the sufficiency of the evidence to support the jury's finding that her compliance with the 2012 agreement was not excused by a mutual mistake of fact. Specifically, Mollie contends Pamela's, Susan's, and her belief—that Bertha's will created a life estate—was a mutual mistake of fact.

The jury was properly instructed in the charge that "[a] mistake of persons as to their private legal rights and interests is a mistake of fact."[6] *See Herrmann v. Lindsey*, 136 S.W.3d 286, 292 (Tex. App.—San Antonio 2004, no pet.) ("[I]f the parties at issue enter into the contract based on a mutual mistake about some legal right a party possesses or does not possess *prior* to the contract at issue, the party may be entitled to rescission of the contract on equitable grounds."); *Furnace v. Furnace*, 783 S.W.2d 682, 686 (Tex. App.—Houston [14th Dist.] 1989, writ dism'd w.o.j.) (quoting *Columbian Nat'l Fire Ins. Co. v. Dixie Co-op*, 276 S.W. 219, 221–22 (Tex. Comm'n App. 1925, judgm't adopted)) (noting a contract may be set aside if it was based on a mutual mistake as to private legal rights and interests). One of the factual issues the jury was required to consider in answering this question was whether Mollie was actually mistaken about the existence of the life estate.

---

[6] We note "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Although we acknowledge this instruction was discussed during the jury charge conference, it is unclear whether Susan was objecting to the instruction as not being a correct statement of the law as opposed to not being law applicable to the facts of the case. On appeal, Susan contends the question regarding mutual mistake should not have been submitted, not that the instruction was an erroneous statement of the law.

At trial, Mollie initially testified she first discovered Bertha's will contained "precatory language," which resulted in an outright bequest of the stock to Marjorie as opposed to the creation of a life estate, when the probate court judge made reference to that term during the hearing on Susan's contest to her appointment as independent executor. *See Knopf v. Gray*, 545 S.W.3d 542, 547 n.7 (Tex. 2018) (per curiam) ("Precatory language requests, recommends, or expresses a desire rather than a command."). Evidence was presented, however, that Mollie referenced that term in an e-mail to Pamela on March 1, 2009, more than three years before the 2012 agreement was signed. In that e-mail, Mollie referred to Marjorie choosing "to pass [the stock] on to us" and asserted "you may or may not accept that she had a choice but the precatory language of the will [Bertha] wrote did leave mom the choice." In an earlier e-mail to Pamela dated February 28, 2009, Mollie asserted "please understand that when mom revised her will this year, she decided to follow grandmother's will but she was not obligated to do so . . . . [I]t is and always has been mother's money." Finally, in a subsequent e-mail to Pamela also dated February 28, 2009, Mollie quotes an e-mail she sent to Susan which stated, "Please keep in mind the account is and always has been mother's property . . . ."

Mollie's brief cites to evidence the jury could consider in finding she believed Bertha's will created a life estate and that Marjorie's will controlled over the transfer on death accounts, including e-mails in which Mollie reassures Pamela and Susan that Marjorie's will controls over the transfer on death accounts.[7] The jury, however, was free to believe Mollie took actions and made reassurances despite believing the "precatory" language in Bertha's will did not create a life estate and that the transfer on death accounts would control. *See City of Keller*, 168 S.W.3d at 819. Such a finding was particularly within the jury's province given Mollie's initial testimony

---

[7] In her reply brief, Mollie emphasizes the references to life estate in the 2012 agreement; however, the jury was required to consider all the evidence.

- 13 -

that she first heard the term "precatory" from the probate court judge. *See id.* Because we defer to the jury's assessment regarding the credibility of the witnesses and the weight to be given the evidence, and because the jury may choose to believe some statements made by Mollie and to disbelieve others, we conclude the evidence is legally and factually sufficient to support the jury's finding that Mollie was not excused from complying with the 2012 agreement. *See id.*

We overrule Mollie's second issue.

### ATTORNEY'S FEES

In her final issue, Mollie contends the probate court abused its discretion in awarding Susan $184,319.20 in attorney's fees because (1) the award was not just and equitable,[8] and (2) Susan failed to segregate her fees among her various counterclaims.

Because Susan sought a declaratory judgment, Mollie concedes the probate court was statutorily authorized to award "reasonable and necessary attorney's fees as are equitable and just." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Under section 37.009, "[t]he decision of whether to award attorney's fees is within the discretion of the trial court, but the question of whether attorney's fees are equitable and just is a question of law." *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 646 (Tex. 2013). "The determination of what fees are equitable and just is 'not susceptible to direct proof but is rather a matter of fairness in light of all the circumstances.'" *Minihan v. O'Neill*, No. 04-18-00847-CV, 2020 WL 444381, at *9 (Tex. App.—San Antonio Jan. 29, 2020, no pet.) (mem. op.) (quoting *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 162 (Tex. 2004)).

---

[8] The parties stipulated the fees were reasonable and necessary.

**A.** **Equitable and Just Fees**

Here, Susan prevailed at a jury trial, and based on the jury's findings, the probate court declared the 2012 agreement to be valid and enforceable. Accordingly, we conclude the award of attorney's fees was equitable and just. *See id.*

**B.** **Segregating Fees**

"[A] claimant must segregate legal fees accrued for those claims for which attorney's fees are recoverable from those that are not." *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017) (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006)). "[T]he need to segregate fees is a question of law." *Tony Gullo Motors I*, 212 S.W.3d at 312. However, "when discrete legal services advance both a recoverable and unrecoverable claim [such] that they are so intertwined [then] they need not be segregated." *Id*. at 313–14.

Here, all of Susan's claims were based on the same facts regarding the 2012 agreement and Mollie's statements relating to that agreement, including her statements relating to the stock, the wills, and the transfer on death accounts. Accordingly, we conclude segregation was not required.

We overrule Mollie's third issue.

## CONCLUSION

Having concluded the evidence was legally and factually sufficient to support the jury's findings, and the probate court did not err in awarding attorney's fees, we affirm the probate court's judgment.

Patricia O. Alvarez, Justice